Whaley, Judge,
delivered the opinion of the court:
This is a suit for the recovery of the difference between the domestic and the export tariff rates of coal transported by the plaintiff from mines in West Virginia to the Naval Fuel Depot at Sewall’s Point, Virginia.
The facts show that the Navy Department advertised for bids for the delivery of certain tons of coal at its Naval Fuel Depot, Sewall’s Point, Virginia, during the years 1923, 1924, and 1927. This depot had been established in 1918 as a reserve depot for the collection and storage of coal to supply naval vessels and for domestic use. There was nothing in the advertisement for bids to show that the Navy Department contemplated the trans-shipment of this coal. The prospective bidders inquired of the plaintiff as to the tariff rate for the transportation of the coal from their mines to the point of delivery at the Naval Fuel Depot at Sewall’s Point and were informed by plaintiff that the tariff rate would be $2.52 per ton of 2,240 pounds, which was the foreign rate as against $2.65 per ton of 2,000 pounds, which was the domestic rate. The defendant accepted the bids at a flat sum for the coal to be delivered at the Naval Fuel Depot without knowledge of the rates given by plaintiff to the bidders. When the coal arrived at plaintiff’s Sewall’s Point terminals, the owners or their agents were notified by plaintiff, and the owners or their representatives notified *146 the plaintiff to deliver the coal to the Naval Fuel Depot at Sewall’s Point. Before or after delivery, the record is not clear as to which course was followed, the plaintiff billed the owners or their representatives for the transportation charges and were paid by the owners or their representatives. The defendant did not pay at any time any amount for the transportation of the coal. After the coal reached the Naval Fuel Depot it was dumped in the supply depot of the Government and commingled with the coal of the several contractors from whom the Government had purchased coal.
In 1929 the Navy Department decided to abandon its storage plant and to dispose of the coal then in storage. Some of it was trans-shipped beyond the Virginia Capes but some sixty-odd thousand tons were used by the Government within the Capes at its different Naval Institutions.
The plaintiff sues to recover the difference between the foreign rate of $2.52 and the domestic rate of $2.65 on the coal used within the Capes. Section 6, paragraph 7, of the Interstate Commerce Act (Title 49, U. S. C. A.), provides as follows:
No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs.
The plaintiff claims that it is entitled to recover the tariff rates imposed by the Interstate Commerce Act for all tonnage of coal delivered to the defendant and not transshipped beyond the Capes at the domestic rate, and also the *147 defendant, having received the coal at its Naval Fuel Depot, was the consignee under implication of law.
There can be no question of the principle that it is unlawful for a carrier to accept less than the tariff rate as compensation for an interstate transportation of goods and that where; the freight charges have not been paid by the consignor, the consignee who accepts delivery of the goods, paying the freight charges, is presumed to have understood that the lawful rate as fixed by the tariff filed with the Interstate Commerce Commission is the correct rate to be paid to the carrier, and if there is an underpayment at the time of delivery, the carrier can proceed against the consignee to collect the difference between the rate collected and the rate lawfully applicable. No agreement between the carrier and the consignee is binding which is less than the lawful rate- as fixed by the tariff. The rule is that the consignee who receives the goods and pays the transportation charges which are less than the lawful rate is responsible for the difference between the- amount paid and the lawful rate. This rule was laid down in Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company v. Fink, 250 U. S. 576, and has been followed consistently in all other cases. The rule clearly shows that the party, consignor, or consignee, or volunteer consignee who pays the freight charges and receives delivery, is the party against whom the railroad can proceed to collect the lawful tariff rate. There is no case cited by the plaintiff that differs from this rule. See Louisville and N. R. Co. v. Central Iron & C. Co., 265 U. S. 59; New York Central & H. R. R. Co. v. York & Whitney Co., 256 U. S. 406; Davis v. Timmonsville Oil Co., 285 Fed. 470; Callaway v. Atchison, T. & S. F. Ry. Co., 35 Fed. (2d) 319.
It is admitted that the plaintiff knew that the coal was shipped to the contractors or their representatives as consignees and not to the defendant. All freight charges were billed to the owners of the coal or their representatives. Defendant did not pay any part of the transportation charges. No representation in the bids or the acceptances of the bids was made by defendant that this coal was to be trans-shipped beyond the Capes.. Those bidding on the de *148 fendant’s advertisement for bids for the delivery of this coal at the Naval Fuel Depot at Sewall’s Point and also the plaintiff railroad company assumed that all, or the greater bulk, of the coal delivered to the defendant would be trans-shipped in Naval vessels beyond the Capes, hut there was nothing on the Government’s part to justify this assumption. During these years the Government vessels were being transformed or converted from coal burners to liquid burners. This fact was known to both the owners of the coal and to the railroad company. The abandonment of the Naval Fuel Depot was due to this change.
The plaintiff admits in its brief that recovery can not be had from the actual consignees or those parties who were actually charged for the transportation of the coal, and who actually paid the transportation charges. It appears that when the coal was delivered at the Naval Fuel Depot by the several contractors with the Government, it was commingled, and it is impossible for the plaintiff to prove what proportion of the coal of each consignee was used in domestic consumption or in foreign consignment.
Plaintiff contends that when it delivered at the Naval Fuel Depot, at the request and under the orders of the consignees, the delivery was made by dumping the coal into the Naval Fuel Depot and that service constituted such an act as to make the defendant the implied consignee. We do not see any merit in this contention. The Government did not pay for this service and never undertook to pay for it. This service was rendered at the request of and as the agents of the consignees. The consignees were the' ones to whom the railroad looked and from whom the railroad collected for this service. The contractors with the Government agreed to make delivery free of all transportation charges at the Government’s Naval Fuel Depot. The defendant is not a consignee actually, or by construction of law, and, therefore, is not responsible for the difference in the transportation charges.
The petition is dismissed. It is so ordered.
Williams, Judge; Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.